IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

LARCHMONT HOLDINGS, LLC,

                                    Plaintiff,                          OPINION and ORDER

          v.                                                            16-cv-575-slc

NORTH SHORE SERVICES, LLC and
WILLIAM BETHKE,

                                    Defendants.

_____

        This lawsuit presents a land contract dispute that arises out of a failed frac sand mining

venture.  Jurisdiction is present under 28 U.S.C. § 1332.  *See* Jan. 13, 2017 Ord., dkt. 41

(denying motion to dismiss for lack of diversity jurisdiction).  Plaintiff Larchmont Holdings, LLC

(created by David Westrate, Neil Benham, and Patricia and Richard McHugh) agreed to pay

defendant William Bethke and *his* LLC, North Shore Services (hereafter collectively referred to

as North Shore) $4 million on a land contract for 300 acres of wooded land in North Central

Wisconsin.  Larchmont anticipated that it could quickly assemble and bring on line a frac sand

mine from which Larchmont's members would reap millions in yearly profits and pay off the land

contract.  The mining operation never got off the ground, which left Larchmont with half a square

mile of forest and past due installment payments on the land contract's $2,275,000 balance. So,

Larchmont brought this lawsuit, asserting seven different claims for relief.  *See* Second Amended

Complaint, dkt. 56.  In its answer, North Shore filed counterclaims for strict foreclosure on its

land contract and for breach of the implied duty of good faith and fair dealing.  *See* dkt. 58 at 57.

        Before the court is North Shore's motion for summary judgment on its strict foreclosure

counterclaim and on all seven of Larchmont's contract-related claims.  *See* dkt. 73.  North Shore

has not moved for summary judgment on its counterclaim for breach of the implied covenant of

good faith and fair dealing. *See* dkt. 58. In its response, Larchmont has raised a series of affirmative defenses to North Shore's claim for strict foreclosure. *See* dkt. 91 at 17-18.

For the reasons explained below, I am granting North Shore's motion for summary judgment against all seven of Larchmont's contract claims. As for North Shore's motion for summary judgment on its strict foreclosure claim, I conclude that North Shore has the right of strict foreclosure under the terms of the land contract and has satisfied the elements of such a claim. That said, I am denying North Shore's motion because it has not developed an argument that some of Larchmont's affirmative defenses–specifically laches, equitable estoppel, and unclean hands–fail as a matter of law.

## PRELIMINARY PROCEDURAL OBSERVATIONS

During the court's review and analysis of the summary judgment submissions, I found that, while the attorneys for both sides presented work that is well-above-average, sometimes they said too much, other times they said too little.

As for the "too much," both parties failed to comply consistently with the court's summary judgment procedures, which are provided in the preliminary pretrial conference order (dkt. 22). The procedures state that

> When a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact. If a responding party believes that more facts are necessary to tell its story, it should include them in its own proposed facts, as discussed in II.B.
>
> *Proc. to be Followed on Mot. For Summ. Judg.*, § II.D.4 at 8.

Contrary to this directive, both parties included new facts—often several paragraphs of new facts—in several of their responses to the opposing party's proposed findings of fact. Accordingly, I have disregarded new facts included only in a party's response to a proposed finding of fact. *Abraham v. Wash. Grp. Int'l, Inc.*, 766 F.3d 735, 737 (7th Cir. 2014) ("[T]his Circuit has routinely held that a district court may strictly enforce compliance with its local rules regarding summary judgment motions."); *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630-31 (7th Cir. 2010) (holding that the district court did not err when it deemed the defendant's proposed findings of fact admitted and refused to consider additional facts for the plaintiff's failure to follow the local procedures on proposed findings of fact).

North Shore also contends that Larchmont has proposed several findings of fact that are duplicative of its responses to defendants' proposed findings of fact, thereby ignoring the procedural requirement that the "purpose of additional findings of fact [by the non-moving party] is to SUPPLEMENT the moving party's proposed findings of fact, not to dispute any facts proposed by the moving party." *Proc.*, § II.B.2 at 7. Although I agree that Larchmont proposed findings of fact that duplicate its responses to North Shore's proposed factual findings, I did not see Larchmont violating this procedural requirement by proposing additional facts *in lieu of* providing responses to defendants' proposed findings.

As for the "too little," notwithstanding the length, detail, and general thoroughness of their presentations, both sides waived arguments by failing properly to present them. As noted below where this occurred, this court does not have the time or resources to explore or analyze matters left unexplored or unanalyzed by the parties. So, pursuant to circuit law, the court has enforced the waivers against the waiving party.

**UNDISPUTED FACTS**

The following facts are undisputed except where noted.

## I.  The Parties

Plaintiff Larchmont Holdings, LLC is a limited liability company organized under the laws of the State of Wisconsin on December 18, 2012, with its principal place of business in Eau Claire, Wisconsin.  The members of Larchmont include David Westrate's Roth IRA and traditional IRA, Dr. Neal Benham's Roth IRA, Patricia and Richard McHugh, and Oakdale, LLC. Oakdale LLC's members are David Westrate and the Westerberry Family Trust.

Defendant North Shore Services, LLC is a limited liability company organized under the laws of the Wisconsin on October 18, 2000, with its principal place of business in Eau Claire, Wisconsin.  William Bethke, a citizen of Wisconsin, is the sole member of North Shore.   For ease of reference, I will usually refer to the defendants collectively as North Shore (primarily in the legal analysis) but will separate them when necessary for clarity (primarily in the facts).

In 2011, North Shore LLC owned approximately 300 acres of land in Jackson County, Wisconsin ("the Property").

Benham and Bethke both are dentists and they have shared a dental office building in Eau Claire, Wisconsin, for over 25 years.  Benham and Westrate are friends and both were involved in the negotiations with Bethke for the purchase of the Property on December 20, 2012. Although McHugh was a purchaser, he did not meet Bethke until sometime in 2013.

In a September 2013 email, Westrate described the members of Larchmont as retired or nearly retired businessmen who each has done business in Eau Claire for more than 40 years and who have a total of more than 150 years of diverse business experience.  Westrate has a masters degree in economics and was the president of an Eau Claire company that created and marketed

4

legal education seminars. Westrate has served on the board of directors of Citizens Community Federal Bank in Eau Claire since 1993. McHugh started Choice Products USA, LLC and served as its president for almost 30 years and served as chairman of the board of directors for Citizens Community Federal Bank for decades.

## II. Benham and Westrate Search for Frac Sand Mining Sites

Around September 2011, Benham started to look for properties to buy in Eau Claire County and Jackson County as possible sites for frac sand mining.[1] On November 7, 2011, Benham met with Mel Bollom, a professional in the sand industry.[2] The two had a wide-ranging discussion about the frac sand market, including how quickly a prospective buyer would need to move into the market, how quickly a buyer could expect to make profits, the total initial investment that would be required, how big a parcel of land would be required, the logistics of transporting mined sand, and the permitting required. After this meeting, Bollom told Benham in an email that "the sand buying companies have made most of their site selections," that "to be in a marketable position" Benham would need to be "in the marketplace within 30-60 days" and that "if this land is located in a non-zoned township, it is a far more desirable situation than a site controlled by county zoning (but, Jackson County is a better County to deal with than Chippewa or Eau Claire)."

---

[1] "'Frac sand' is a high-purity quartz sand with very durable and very round grains. It is a crush-resistant material produced for use by the petroleum industry. It is used in the hydraulic fracturing process (known as 'fracking') to produce petroleum fluids . . . ." geology.com/articles/frac-sand, last accessed Nov. 8, 2017.

[2] The parties agree that Bollum is a person who identifies suitable locations that contain sand for industrial applications, acquires mineral rights by negotiating an agreement with the land owner, and then sells the mineral rights to sand companies. Since 2007, Bollom has negotiated between 25 and 30 mineral rights agreements.

Benham approached his friend, David Westrate, about buying land together to develop a frac sand mine. Westrate was receptive, so in 2011 and 2012, Westrate and Benham visited potential frac sand investment properties with Bollom. By late 2011 or early 2012, Benham approached Bethke about developing the Property–and possibly other nearby properties–as a sand mine. In December 2011 and February 2012, Bollom visited Benham's and Bethke's dental offices to provide an informal presentation about the frac sand industry. Jim Geraghty, Mark Sontag, and Jeff Jones, who all were landowners who owned property near the Property, also were present. (The parties dispute what these individuals understood Bollom's intended role would be with respect to the group.)

On March 7, 2012, Benham emailed Wisconsin's Department of Natural Resources (DNR), stating that he was "getting ready to open a sand mine in Jackson County and would like to know what are the clean air regulations and any permitting that is required." On March 9, 2012, the DNR responded that the limited information provided about the proposal made "it difficult to tell" which DNR permits would be needed, but that "in addition to an air permit," the "[t]ypical permits" would include "non[-]metallic mining[,] general stormwater permits, high capacity well permits, potential wetlands permits and endangered and threatened species and archeological reviews. In addition the counties administer NR 135 non[-]metallic mining reclamation permits."

Benham also began researching the machinery needed for sand mining. After being told on May 18, 2012 about an 80-acre plot in the Dover, Wisconsin that was "adjacent to other tested and proven frac land" possibly coming on the market, Benham indicated that he was "[r]eady to move ASAP."

### III. Bethke's Actions With Respect to Using the Property for Frac Sand

In November 2011, Bethke began learning more about sand mining and began investigating whether the Property had frac sand reserves. He provided samples of sand from the Property to Bollom for testing, and those samples looked promising. Bollom also worked with Bethke, Benham, and others to collect and analyze sand samples from the nearby properties owned by Geraghty, Sontag, and Jones. On March 10, 2012, Bethke and his then-girlfriend (now wife), Connie Brenny, joined Benham on a visit to a sand processing operation owned by Badger Mining Corporation, in Merrillan, Wisconsin, less than ten miles from the Property.

In an email to Bollum dated March 31, 2012, Bethke stated that he was "leaning towards selling the whole property. I enjoy treating [patients]. I know there is a lot of money to be made in a frac sand operation. But I think I would prefer to sell the 300 plus acres and let someone else run with it." During the summer and fall of 2012, Bethke still was considering various potential ways to sell the Property, including selling the Property by itself or potentially selling the Property in a package deal involving neighboring landowners. In late July and August 2012, Bethke considered having Robert Archibald, a frac sand industry consultant, represent him as a broker to sell the property. On July 31, 2012, a testing company notified Bethke that the samples from his land showed it to contain "excellent sand" and "very good frac sand." On the same day, Bollom told Benham in an email that Bethke was "giving thought to how he might arrange some type of land contract sale on a portion of [his] land."

As part of Bethke's investigation into finding potential buyers, Connie Brenny emailed Badger Mining Corporation on August 8, 2012 to see if that company would be interested in seeing Bethke's positive test results for the Property. On August 14, 2012, Benham sent a fax

to Badger Mining—on Bethke's behalf from the fax machine of their shared office—that included maps of the Property, the sand testing results, and the cover emails from the testing company indicating that it was "excellent sand" and that various tests "all show this to be very good 'frac' sand." Bethke sent additional sand test results to Badger Mining in September and October 2012.

Between September and November 2012, Bollum was showing the Property and some of the nearby properties to sand company representatives who were interested in buying sand. During these visits, Bollum did not focus on the Property because the sand companies would view it as a viable site only in conjunction with the other properties. As late as November 2012, Bethke told Bollum he was doing "good job" when he learned about the visits Bollum arranged with sand companies.

Also in the fall of 2012, Bethke discussed with a few businesses— Falls River Group, Sand Source Services, and GulfStar Group—possible transactions involving the use or sale of the Property for frac sand mining. Bethke's wife, Connie Brenny, had met Houston lawyer Robert Viguet on a plane, and Viguet was involved in Bethke's discussions with GulfStar and Sand Source. In late October or November 2012, Bethke asked Bryan Frederickson of GulfStar for a contract to represent both his land and that of Geraghty, and Bethke told Westrate this. On November 5, 2012, Bethke informed Westrate and Frederickson that sand companies were continuing to look at his property and that "lots" of groups were interested. Bethke's discussions with Frederickson continued through late November 2012.

## IV. Pre-Contractual Efforts To Change The Property's Zoning

Based on a suggestion from Bollum, Bethke investigated the process necessary to change the zoning on his property from forestry to industrial. On February 14, 2012, Bethke told Bollum that Terry Schmidt, the head of zoning for Jackson County, told him that approval for mining should take 60 days or less. On or about February 21, 2012, Bethke submitted an application with the Town of Cleveland to have the property's zoning changed from forestry to industrial extractive. However, in May 2012, the town issued a resolution opposing Bethke's zone change petition; Jackson County later relied on that decision in part to deny a zone change petition that Bethke submitted in June 2012. Bethke told Benham about Cleveland's denial of the zoning change around the time it occurred.

In August 2012, Benham knew that one of the reasons Bethke's zone change application was denied was regarding concerns about the effect on the 40-acre parcel owned by the Zillmer Family Trust that was bounded by Bethke's property. On August 5, 2012, Benham emailed one of the Zillmers to let them know that he was interested in the 40 acres and would entertain any offer to purchase it. (The parties dispute whether Bethke told Benham that the other issues that he had with the zoning petition had been resolved.) In a September 20, 2012 email, Bethke and Brenny told Viguet that Bethke "had already applied for permits and attended some meetings, so the permit process is in the works and should be in place soon."

## V. Larchmont's Purchase of The Property

### A. Initial Proposals

On August 15, 2012, Benham emailed Westrate: "Try this scenario. Dave and Neal buy Bill's land for 4M with 1.2M down." Westrate responded stating that Benham had done a "[n]ice job" and that it "look[ed] like Plan A so far." In a document titled "SAND PLAN A 8.15.12," Westrate wrote: "One problem is that the investors may balk at investing in land that is not paid for, and has $2.8 million debt against it." On August 18, 2012, Westrate drafted various thoughts about a frac sand mining investment and created a spreadsheet outlining "Plan A," which meant buying Bethke's land for $4 million with $1.2 million down, leaving Benham and him with what he considered an "unrealistic" amount of $80,000 in working capital. Westrate estimated that the various legal, accounting, consulting, permitting, and regulatory costs required to start a mining operation on Bethke's property would require $800,000 in working capital. He wrote: "It will take upwards of $2.5 million working capital or more, to cover start-up costs and paying the miner/hydrosizer while waiting to sell wet sand and actually get paid. . . . It looks to me like the wet sand plant is more complicated than we have been led to believe." Westrate also wrote: "I'm beginning to see why Bill wants to sell outright. I'm beginning to understand that there may not be an easy, or cheap, way to do this. We may have to put in more $$, bring in more people, or borrow money, thus increasing risk to our financial futures."

On September 15, 2012, Westrate drafted notes to himself, which he titled "LATEST SAND MINE THOUGHTS," and expressed an interest in buying the Property via a land contract. On September 28, 2012, Westrate sent a "Purchase Pro-Forma" spreadsheet to Benham outlining various possibilities for buying the Property at a sale price of either $4 or $5

million.  The cover email to that spreadsheet outlined a deal in which Benham, Westrate, and Bollom would form a three-member LLC to purchase the Property.

On October 28, 2012, Westrate sent Benham an email in which he wrote:  "Neal, it is getting close to the end of the year, and events are overtaking us. I think it is getting time for us to buy our share of Bill [*Bethke*]'s property rather than waiting for the royalty deal to be made . . . If Bill still wants to get this done by the end of the year, let's do it."  Benham replied via email that same day that he would talk to his investment advisors "to make sure" he had "all of the right procedures" in place to move quickly and concluded, "I think the time is now."

In the fall of 2012, Westrate and Benham began discussing proposals for a sand mine on the Property.  One idea proposed by Westrate was acquiring the Property through the purchase of North Shore's assets.  (The parties dispute the exact nature of their conversations with each other during this time period.)  Bethke retained Michael Vinopal, an attorney from Eau Claire, to prepare the title conveyances and land contracts on behalf of North Shore with respect of the sale of the Property to Larchmont.  Although Vinopal did not represent Larchmont, and Larchmont did not have legal counsel in its negotiations with defendants, Richard Eaton, an attorney in Vinopal's law office, had a role in drafting various versions of an operating agreement that Westrate proposed initially for North Shore and then Larchmont.[3]

(The parties dispute whether Bethke and his wife met with Westrate and Benham about the Property or discussed frac mining in the fall of 2012, and whether Bethke told Westrate and Benham that he was only interested in selling the Property and not in partnering with them in a frac sand mining operation.)

---

[3] Although the parties dispute what role Vinopal himself had in the drafting of these agreements, emails show that Eaton drafted these agreements and incorporated suggestions from Westrate.  *See* dkt. 71, exh. 13 at 1.

**B. November 12 Draft Operating Agreement**

On November 15, 2012, Vinopal's office sent Bethke a draft North Shore operating agreement, along with comments from Westrate. The draft provided that (1) Bethke, Westrate, Westrate's IRA, and Benham's IRA would be members of the limited liability company, with Bethke owning 25%; (2) Westrate, Westrate's IRA, and Benham's IRA would pay $4 million to Bethke to purchase their shares of North Shore; (3) they would pay Bethke a down payment of $1.4 million; (4) the remaining $1.6 million in payments to Bethke would be made over a three-year period; and (5) "[t]he members anticipate that the payments will be made from periodic royalty payments received for the removal of sand from the property," but "[t]he parties acknowledge that payment in full must be completed within three years, regardless of the source of funds." Dkt. 77, exh. 13 at 5-7. On December 4, 2012, Bethke faxed a version of Westrate's proposed draft operating agreement and a spreadsheet of property parcels to his financial advisor, Mark Orgel, with a request to "get back to me please." Orgel discussed the document with Bethke from a financial planning perspective, including making recommendations relating to tax structure. None of the parties signed this draft agreement.

**C. The Badger Mining Offer**

On December 3, 2012, Mathew Hess[4] of Badger Mining Corporation emailed Bethke a proposal with respect to an offer on the Property and adjoining land owned by others. Attached to the email was a spreadsheet entitled "Parcels Offers" in which Hess listed purchase prices that

---

[4] Hess is an engineering leader for Badger Mining, where he has worked since 1997; he has been responsible for land acquisitions for over ten years.

Badger Mining would offer for each of the separately-owned parcels. The offer for the Property was $3,449,750. However, Hess stated in his email that "[a]ll five offers would be contingent upon one another as we would need to secure all in order to justify development in this area." Dkt. 77, exh. 4 at 1. Before leaving for a hunting trip in South Dakota on December 5, 2012, Bethke showed the spreadsheet to Benham. At some point, Bethke also notified Westrate about the offer amount with respect to the Property. (The parties dispute whether Bethke shared the email explaining the contingency with Benham or Westrate.)

During his drive to South Dakota on December 5, 2012, Bethke spoke to Benham and Hess several times via cell phone regarding the sale of the Property. The other passengers in the vehicle with Bethke–including Greg Bohlig and Don Bethke–heard both sides of these conversations because Bethke's phone was connected by Bluetooth to the vehicle's speaker systems. (The parties dispute what Benham said to Bethke during the phone calls on that day and on what date Bethke made his decision to sell the Property to Benham and Westrate instead of selling to Badger Mining.)

### D. Initial Ideas for a Land Contract

On Monday, December 10, 2012, Connie Brenny sent Vinopal her understanding of what terms should be included in the land contract, including a purchase price of $4 million, a $2.5 million down payment, three annual payments of $500,000 to cover the remaining amount, an interest rate of 1.9%, and a provision that the Property would be returned to Bethke in the event of a default. (The parties dispute whether Bethke assured Westrate, Benham, or McHugh that he would never foreclose on the land contract.)

### E. December 12 and 18 Draft Operating Agreements

On December 12, 2012, Westrate emailed Benham and Bethke a new draft "North Shore Services, LLC Operating Agreement," with a cover email that stated that "I think this embodies what it sounded like [Bethke] wants to happen, together with what we need to make it work for us." Dkt. 77, exh. 41. This draft agreement provided that the Property would be sold for $4 million, with a $1.5 million down payment, three installment payments of $500,000, and final balloon payment of $1 million. The proposed members of the yet-to-be-incorporated purchasing LLC were Westrate and his Roth IRA, Benham and his Roth IRA, and McHugh. Bethke was identified as the seller in the document but neither he nor North Shore Services LLC was listed in the signature block in the draft operating agreement.

On December 13, 2012, Bethke faxed a copy of the draft to Orgel with a cover sheet that stated:

> I'm quite frustrated with Dave W. He sent me a purchase contract with a down payment of only 1.5m not 2.5. I don't know if he's playing games or just a mistake. But I'm very close to calling Badger and ending it. At 1.5 down it doesn't make sense. I'd be getting 3.5 from Badger now. At a lower tax rate and the money is working for me. If Dave wants to do this he has to decide today or I'll call Badger and be done. Please convey this to Dave.

On December 18, 2012, Westrate sent a slightly different operating agreement entitled "Larchmont Holdings, LLC Operating Agreement" to Benham, Bethke, and Vinopal. His cover email stated that "this is the deal that I understand will meet everyone's approval." Dkt. 86, exh. 2 at 1. The draft reiterated the $4 million purchase price but now referenced the fact that a land contract would govern the deal between Larchmont and North Shore:

> On or about December 21, 2012, William Bethke entered into an Agreement of Installment Sale with Larchmont Holdings, LLC (the

14

Company), and by extension, the individuals named in Item 2. below as Members of the Company, to sell all shares of North Shore Services, LLC, upon the terms of sale described in the attached Land Contract, incorporated herein by reference.

*Id.* at 3.

The drafts that Westrate sent on December 12 and December 18 both stated the following in an introductory paragraph in bold font:

> **It is the stated intent of all parties to this transaction that the Company will aggressively pursue marketing the frac sand on the property such that the Installment Sales Agreement payments will be made from profits generated by those efforts. To this end, the balance due on Installment Sales Agreement after the down payment made at closing is considered by all parties as a nonrecourse loan, meaning that the loan is secured by the assets of the Company, and not personally guaranteed by the Members, to wit: in the event that the Company is unable, in spite of its best efforts, to profitably market the frac sand on the land and the installment sales payments are not made, the Seller's recourse it to foreclose on the Company. It is agreed by all parties that in light of the offer already received by the Seller, such an event is unlikely.**
>
> **\*   \*   \***
>
> **The Company, on behalf of its Members, accepts the risks inherent in such a natural resources development project as reasonable to the Company and its Members, given their present circumstances, in light of the potential to profit from exploiting the resources on the property.**

*Id.*; dkt. 77, exh. 41.

Defendants never signed either of these documents or made any statement that North Shore would be paid from the profits of a frac sand operation.

## F. Execution of Agreements on December 20

On December 20, 2012, the members of the newly-incorporated Larchmont Holdings LLC–namely Westrate and his Roth IRA, Benham's Roth IRA, Patricia and Richard McHugh, and Oakdale, LLC—executed a document titled "Operating Agreement of Larchmont Holdings LLC." *See* dkt. 80. The agreement includes an Exhibit A that discusses capital contributions and membership.

Meanwhile, on December 20, Bethke and Brenny went to Vinopal's office to sign four documents drafted by Vinopal: a four-page form land contract, Exhibit A, Exhibit B, and an Addendum. Vinopal had filled out a Wisconsin State Bar form land contract pursuant to Bethke's instructions: $4 million total for the land, with $1.5 million down, and five installment payments of $500,000—beginning on May 1, 2013 and continuing on December 1 for the next four years—at an interest rate of 0.9%. The form contract contains a provision allowing the vendor (North Shore) the option to terminate the contract and recover the property through strict foreclosure with a period of redemption to be conditioned upon full payment of the outstanding balance, in the event of a default lasting for a period of 10 days after a payment's due date. The addendum to the land contract gave Bethke exclusive control of hunting rights on the property until the contact was satisfied and provided him a life estate interest in the "cabin and out buildings on the property, the pond and the surrounding property normally associated with the use of the cabin until he is paid in full." Dkt. 58, exh. 1 at 9.

The two exhibits attached to the form contract are titled "Legal Descriptions for Land Contract" and "Additional Terms for Land Contract." Bethke signed the form contract and the addendum, both of which Westrate and McHugh countersigned later that day. Bethke never told

16

Vinopal to include the unsigned December 18 draft of the Larchmont operating agreement as part of the land contract, and it was not included as an exhibit. Vinopal did not record the land contract with the register of deeds, and neither Vinopal nor Bethke has the original signed version of the land contract.

### G. Larchmont's December 22 Resolutions

On December 22, 2012, Larchmont adopted the following resolutions by unanimous consent:

> [O]n or about December 21, 2012, William Bethke agreed to enter into an Agreement of Installment Sale with Larchmont Holdings, LLC (the Company) to sell all the real estate in North Shore Services, LLC, upon the terms of sale described in the attached Land Contract, incorporated herein by reference, to wit: $1.5 million down payment at time of closing, a $500,000 payment paid on May l, 2013, and four additional $500,000 annual payments beginning on December 1, 2013,
>
> *   *   *
>
> [I]n the event that the Company is unable, in spite of its best efforts, to make the scheduled Land Contract payments, the Seller's recourse is to foreclose on the real estate owned by the Company,
>
> *   *   *
>
> The Managing Member will engage such resources and organizations as necessary to aggressively pursue marketing the frac sand on the property such that the Land Contract payments will be made as scheduled, from profits generated by those efforts and to this end it is agreed by all parties that the Company, on behalf of its Members, accepts the risks inherent in such a natural resources development project as reasonable to the Company and its Members . . . .
>
> Dkt. 80 at 8.

## V.  The Parties' Relationship Breaks Down

### A.  First Missed Installment and May 2013 Amendment

In January 2013, Benham, McHugh, and Westrate emailed each other about contacting investors, buyers, or brokers for the Property that they had just purchased from Bethke. However, no frac mining had begun by the time the first installment payment came due under the land contract.

On April 21, 2013, Westrate wrote to McHugh that

> It might be useful for you to ask Bill at the proper time, how he thought we would be able to make that May 1 payment. Even if we made a deal it was a pipe dream to expect that kind of cash so soon. That payment schedule makes no sense since our preference was to give him all earnings until he was paid off. If we actually had enough earnings to pay him we would get the money either way, so what did he expect to happen if, as is now the case, we didn't have enough earnings to pay him?

That same day, Westrate emailed Vinopal, stating that he "urgently" needed "a copy of the land contract." Vinopal's assistant responded with an email that attached an unsigned draft Larchmont Holdings operating agreement dated December 17, 2012[5]; the State Bar form land contract executed on December 20, 2012; Exhibits A and B; and the addendum. The assistant wrote: "Here is a copy of what we have. As you can see, we do not have a signed copy of the Operating Agreement pages."

In late April 2013, McHugh contacted Bethke to tell him that Larchmont could not make the first payment of $500,000. Bethke agreed to enter into an amendment to the land contract whereby Larchmont would pay North Shore $100,000 on May 1 and the remaining $400,000

---

[5] The parties refer to this document as the "December 18 draft" because that is the date that Westrate sent it to Benham, Bethke, and Vinopal.

on September 1.  At the request of Larchmont, Vinopal drafted the May 6, 2013 amendment to the land contract.  The May 6 amendment does not mention future payments coming from sand mining profits and states expressly that "Vendor's forbearance in this instance shall not be construed as a waiver of their [*sic*] rights and remedies in the future."  Around the time the parties signed this amendment, Larchmont paid North Shore $100,000 that had been loaned to Larchmont by Westrate and Benham.

### B.  2013 Zoning Denials

A March 20, 2013 frac sand assessment report commissioned by Larchmont concluded that the quality of the frac sand on the property was "quite good," and a June 2013 report commissioned by Larchmont concluded that the property had a considerable volume of frac sand resources.  On June 11, Westrate emailed Benham and McHugh about contacting potential investors, buyers, or brokers.

Around August 1, 2013, Larchmont filed the paperwork for a zoning change in the Town of Cleveland and the Town of Garfield.  The Town of Cleveland Board of Supervisors voted 2-1 to oppose the zoning petition.  Supervisors Andrew Sorenson and Joe Egloff, who had both been elected as new supervisors in April 2013, voted against the petition.  On August 23, 2013, Westrate emailed this message to Benham and McHugh:

> I think we need to get together with Bill as soon as possible to discuss the payment situation.  I would like us to point out to him the dilemma we all are in, that we can't pay him the next two payments, total $900,000, for reasons that are not under our control, including the changes in the market: the drop in prices, the increase in supply, the unwillingness of buyers to give contracts to people who are not permitted and have a processing plant, etc. And the changes in the permitting process:  that the new member of the

Cleveland board is against fracking and everyone is telling us it is going to be tough.

\* \* \*

If we got a buyer tomorrow, the earliest we can reasonably expect to begin mining sand and processing it is late summer 2014, possibly later. . . . How long that will take is completely unknown, as it is subject to so many unpredictable influences.

Dkt. 77, exh. 47.

### C.  Second Missed Installment and December 2013 Amendment

When the $400,000 September 1, 2013 payment came due on the amendment to the land contract, McHugh once again contacted Bethke with the news that Larchmont would not make the payment.  North Shore and Larchmont eventually agreed to another amendment to the land contract on December 31, 2013:  Larchmont would pay $125,000 on December 31, 2013, then another $100,000 on July 1, 2014, and $800,000 on September 1, 2015 (and the remaining $1,530,000 would then be paid in installments over the following three years).  The December 2013 amendment did not mention future payments coming from sand mining profits and states that "[f]ailure to comply with any of these terms shall constitute default and all remedies available under the original contract may be utilized by Vendor."

Larchmont made a $125,000 payment to North Shore on December 31, 2013.

Larchmont has not made any more payments to North Shore under the land contract. The amount overdue is $1,415,000 plus interest.  North Shore did not foreclose on Larchmont until it filed its counterclaim for strict foreclosure in this action on February 1, 2017.

## VI. Post-Contractual Uses of Property

Bethke's use of the property after the land contract was signed—including ATV driving and horseback riding—did not interfere with or impair Larchmont's ability to develop a frac sand mine or sell the Property. Larchmont has never been denied access to the Property since entering into the land contract. Crops planted on the Property were directly in front of the cabin to which Bethke holds a life estate. Larchmont members were aware of these uses, yet did nothing to try to stop them. Bethke harvested timber on the Property because it was required on the state's managed forest crop law program. The amount paid for the timber removed from the Property was $11,549.24. (The parties dispute whether this amount ever got credited to Larchmont.)

Westrate and Benham have identified three alleged interactions between Bethke and nearby property owners–Bob Zillmer, Jerry Jenks, and Dave Holman–claiming that Bethke caused problems with neighbors.

## ANALYSIS

## I. Legal Standard

A court must grant summary judgment when no genuine issue of a material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court must view the evidence in the light most favorable to the nonmoving party, but "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.  A Summary of the Parties' Disputes

Larchmont's second amended complaint (dkt. 56) alleges seven separate claims related to the parties' negotiations and agreement with respect to Larchmont's purchase of the Property from North Shore:

I.  Fraudulent Inducement

II.  Frustration of Purpose

III.  Unjust enrichment

IV.  Reformation

V.  Breach of the Implied Covenant of Good Faith and Fair Dealing.

VI.  Illusory Contract

VII.  Breach of Contract

In count I of its counterclaims, North Shore seeks strict foreclosure under the terms of the land contract, based on its allegations that Larchmont has defaulted on its payment obligations. In its answer to the counterclaim, Larchmont raised the affirmative defenses of laches, unclean hands, fraud, and equitable estoppel.

The core dispute that drives this lawsuit is the parties' conflicting views as to which payment terms actually constitute the complete and final agreement purchase agreement.  The parties agree that the contract includes these documents:

- State Bar of Wisconsin form contract executed on December 20, 2012

- Exhibit A entitled "Legal Descriptions of Land Contract"

- Exhibit B entitled "Additional Terms for Land Contract"

- An "Addendum to Land Contract" dated December 20, 2012 and signed by Bethke, Westrate and McHugh

- An "Amendment to Land Contract" dated May 6, 2013 and signed by Bethke and McHugh

- An "Amendment to Land Contract" dated December 31, 2013 and signed by Bethke, Benham, Westrate, and McHugh

Larchmont, however, contends that the land contract *also* includes the payment terms that were repeated in the December 12, 2012 and December 18, 2012 versions of the draft operating agreement that Westrate provided to Bethke and Vinopal before the land contract was signed. Larchmont points to extrinsic evidence that it believes shows that the parties agreed that future payments owed under the land contract would be made from profits earned from the sale of sand mined from the property. Larchmont contends that the terms of the contract are hotly disputed and prevent entry of summary judgment as to defendants' foreclosure claim and many of its own claims and affirmative defenses. Larchmont also argues that there are genuine issues of material fact concerning whether Bethke promised Bentham and Westrate that he would never foreclose on the property and whether he made misrepresentations about rezoning the property and Badger Mining's intention to buy the property.

I will first address the contours of the parties' agreement in the context of North Shore's strict foreclosure counterclaim and then turn to Larchmont's affirmative defenses and contract claims, which essentially function as affirmative defenses to foreclosure.

## III.  Strict Foreclosure

The Wisconsin Supreme Court has explained that land contracts "are an important and long-standing instrument in Wisconsin real estate transactions" because they "provide a number of advantages," including a smaller down payment, no mortgage transaction costs, greater

flexibility in structuring terms, installment payments for beneficial income tax advantages, and alternative remedies in the event of default. *Steiner v. Wisconsin Am. Mut. Ins. Co.*, 2005 WI 72, ¶ 22, 281 Wis. 2d 395, 405, 697 N.W.2d 452, 457. The land contract vendor (the seller) holds legal title as security for the unpaid balance of the contract and the land contract vendee (the buyer) holds equitable title, which gives it "full rights of ownership" unless the contract provides otherwise. *Id.* at ¶ 23.

When a land contract vendee defaults under the terms of the contract, the vendor can select from a number of remedies. *Kallenbach v. Lake Publications, Inc.*, 30 Wis. 2d 647, 651-52, 142 N.W.2d 212 (1966); *Republic Bank of Chicago v. Lichosyt*, 2007 WI App 150, ¶ 18, 303 Wis. 2d 474, 488, 736 N.W.2d 153, 159. Strict foreclosure is a long-standing equitable remedy available to the vendor. *Steiner*, 2005 WI 72 at ¶ 25. "In strict foreclosure, the land contract vendor forgoes his or her right to collect the amount remaining on the debt and instead recovers the property." *Id.* at ¶ 26 ("In the event of a vendee's default on a land contract, under strict foreclosure the circuit court's judgment sets a period, called the redemption period, in which the vendee must pay up or lose all his or her interest in the land.").

It is undisputed in this case that Larchmont failed to make a payment after December 2013. North Shore contends that this puts Larchmont in default of the land contract. Larchmont contends that it did not breach any contractual obligation by failing to make the installment payments because those payments were contingent on Larchmont's generation of profits from the sale of frac sand mined on the Property, and to date, no frac sand has been mined on the property. Larchmont argues that a jury must decide the dispute whether Larchmont's duty to make installment payments arose per the written schedules in the contract

regardless whether any frac sand had been sold, or whether Larchmont's duty to pay arises only after sand has been sold.

### A. Authenticity of Contract

As an initial matter, Larchmont contends that because North Shore is unable to produce the original signed land contract, it would be inequitable to accept the copy as a true and accurate representation of the parties' agreement. Under the best evidence rule, an "original writing, recording, or photograph is required in order to prove its content unless [the rules] or a federal statute provides otherwise." Fed. R. Ev. 1002. However, "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity." Fed. R. Ev. 1003. Because Larchmont is challenging the admission of the duplicate contract, it has the burden to demonstrate that a "genuine issue of authenticity exists." *United States v. Chapman*, 804 F.3d 895, 902 (7th Cir. 2015). Apart from a general reference to "all of the evidence challenging North Shore's claim that Exhibit 1 [to its answer] shows the authentic Land Contract," Larchmont does not develop this argument. Moreover, both sides agree that the land contract includes all of the signed documents listed above and contained in Exhibit 1; the only dispute is whether the unsigned draft Larchmont operating agreement also was incorporated into the agreement. Therefore, Larchmont has failed to meet its burden of showing that a genuine issue of authenticity exists that affects the outcome of this case. The copy is admissible.

### B. Terms of Parties' Agreement

Generally, "the interpretation and application of a contract to undisputed facts present a question of law." *Maryland Arms Ltd. Partnership v. Connell*, 2010 WI 64, ¶ 21, 326 Wis. 2d 300, 310-11, 786 N.W.2d 15, 20. The Wisconsin Supreme Court has explained that the "primary goal in contract interpretation is to 'give effect to the parties' intent, as expressed in the contractual language,'" and to "interpret the language 'consistent with what a reasonable person would understand the words to mean under the circumstances.'" *Id.* at ¶ 22 (quoting *Seitzinger v. Cmty. Health Network*, 2004 WI 28, ¶ 22-23, 270 Wis. 2d 1, 676 N.W.2d 426). Courts interpret clear and unambiguous contract terms literally, but when the contract language is ambiguous, "two further rules are applicable: (1) evidence extrinsic to the contract itself may be used to determine the parties' intent and (2) ambiguous contracts are interpreted against the drafter." *Id.* at ¶ 23 (citing *Seitzinger*, 270 Wis.2d 1, ¶ 22 and *Gorton v. Hostak, Henzl & Bichler, S.C.*, 217 Wis.2d 493, 506, 577 N.W.2d 617 (1998)). In cases in which a contract is ambiguous and must be construed by using extrinsic evidence, the contract's interpretation presents a question of fact for the jury. *Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶ 32, 330 Wis. 2d 340, 355, 793 N.W.2d 476, 483.

In this case, the payment terms of the December 20, 2012 form contract and addendum and the 2013 amendments are clear: Larchmont was to make various installment payments, and if it did not make those payments, then North Shore had the right to foreclose. Not so fast, argues Larchmont: it contends that there is more to the story because the contract included payment terms that were outlined in two draft operating agreements and North Shore intended to make these terms part of the land contract. Larchmont continues: for some reason, these

payment terms were not included in the operating agreement actually executed by the members of Larchmont on December 20, but Larchmont later passed a resolution on December 22 indicating its intent to pay the installments on the land contract out of its frac sand proceeds.

Larchmont's arguments implicate the parol evidence rule, which the Wisconsin Supreme Court has summarized as follows:

> When the parties to a contract embody their agreement in writing and intend the writing to be the final expression of their agreement, the terms of the writing may not be varied or contradicted by evidence of any prior written or oral agreement in the absence of fraud, duress, or mutual mistake.

> *Town Bank*, 210 WI 134 at ¶ 36 (citing *Dairyland Equip. Leasing, Inc. v. Bohen*, 94 Wis.2d 600, 607, 288 N.W.2d 852 (1980)).

Therefore, the first question is whether the parties intended the written contract—in this case, the form contract, addendum and amendments—to be the final and complete expression of their agreement. If they did, then the contract is integrated and "the court construing the contract may not consider evidence of any prior or contemporaneous oral or written agreement between the parties," absent the existence of fraud, duress, or mutual mistake. *Id.* at ¶¶ 37-38. "If the contract is not integrated, then the parol evidence rule is inapplicable." *Id.* at ¶ 38. However, extrinsic evidence is always admissible with respect to the issue of integration. *Id.* Further, "[t]he determination of whether a contract is integrated is a question of law for the trial judge to decide." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 878-79 (7th Cir. 2005) (applying Illinois law provisions similar to Wisconsin law and finding agreement was fully integrated even without a merger clause).

Larchmont points out–correctly–that the December 20, 2012 land contract does not contain a merger or integration clause, then argues that there is extrinsic evidence that the land

contract was not integrated and actually includes the provision in the December 12 and 18 draft operating agreements stating that installments would be paid out of the frac sand profits. In the alternative, Larchmont argues that even if the contract was integrated, there is evidence that the parties' agreement about how the installments were to be paid was excluded from the land contract because of fraud on the part of North Shore, or a mutual mistake by the parties. Larchmont does not develop any argument in its response brief concerning the "extrinsic evidence" that it believes supports its position.

In hopes of creating a genuine issue of material fact with respect to the issue of integration, Larchmont cites only the numbers of a few of its additional proposed findings of fact (nos. 51, 60, and 63) and various responses to defendants' proposed findings of fact (nos. 130, 134-35, 137, 141-46, 158-59, 163, 173-74 and 181). *See* Pltf.'s Br. in Resp., dkt. at 10-12. This isn't going to cut it. The Court of Appeals for the Seventh Circuit has made clear that "[p]erfunctory and undeveloped arguments are waived, especially when . . . a party fails to develop the factual basis of a claim . . . and, instead, merely draws and relies upon bare conclusions." *Campania Management Co., Inc. v. Rooks, Pitts & Poust*, 290 F.3d 843, 852 (7th Cir. 2002). Further, "[w]e often call summary judgment, the 'put up or shut up' moment in litigation, . . . by which we mean that the non-moving party is required to marshal and present the court with the evidence she contends will prove her case." *Goodman v. National Security Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). *See also D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015) (court not obligated to sift through record in search of evidence to support plaintiff's claim).

Even if this court cuts Larchmont some slack and connects the dots on its own, Larchmont fares no better (which might explain why Larchmont did not do more to develop this argument).

Piecing together the evidence cited by Larchmont and briefly summarized by Larchmont in the introductory section of its brief (*see* Pltf.'s Resp. Br., dkt. 91 at 2), I understand Larchmont to be relying on the following facts to support its position:

- Westrate sent Bethke the draft operating agreements on December 12 and 18, 2012 with a cover email that stated that "this is the deal that I understand will meet everyone's approval."

- Bethke communicated the terms in the draft operating agreements to his financial advisor.

- Vinopal testified in his deposition that he received and was aware of the December 12 and December 18 draft documents and believed that the terms reflected "the deal" between the parties.

- When Larchmont requested a copy of the land contract from Vinopal in April 2013, Vinopal's office provided it with a copy of the unsigned, December 18 draft operating agreement.

None of these facts, either alone or in combination, creates a plausible inference that the parties intended their land contract to include one specific payment term from the introductory paragraph of an unsigned, draft operating agreement, especially in light of the undisputed fact that Bethke never signed or affirmatively agreed to such a term. Even if a jury could reasonably infer from Westrate's email and Bethke's discussions with his financial advisor that Bethke *considered* signing on to the operating agreement at one point, *he never did so*. The December 2012 drafts of the operating agreement, like the signed version, did not provide Bethke with an ownership interest in the LLC and there was no signature block for Bethke or North Shore. The fact that Vinopal's office included a copy of the unsigned draft operating agreement in the documents that it forwarded as the land contract says nothing about the intent of the parties

themselves and does not mean that the unsigned draft operating agreement somehow became part of the land contract.

In addition, Vinopal's testimony is inconclusive and not helpful to Larchmont's position. Vinopal was questioned about the introductory language in the December 18, 2012 draft operating agreement concerning payments being made from frac sand profits. In response, he stated that he did not remember talking about that provision with Bethke specifically, but "it was that they would hopefully be able to do that, to make that work, so they wouldn't have to put any of their, you know, outside money in" and "I mean, I think it was -- that was the deal." Dkt. 65 at 55-56. When asked whether those were terms that he was going to put into the land contract, Vinopal stated that "Well, sure. Yeah. Something that would be acceptable to them, yeah. But I think if this—if this was the deal, it seems like that was the intent. I mean, that's what the cover letter says." *Id.* at 56. However, Vinopal clarified that

> [W]e don't draft a document and expect that that's the final draft. I mean, it's always, you know, 'Here it is, you know, what do you think, do you want any changes made.' So I don't know what happened in this case. But, you know, we would have tried to do it to the best of everybody's satisfaction to get the terms in there that people felt were relevant and certainly instruct them to look at it carefully and make sure they have what they want or they want something or want something out.

> *Id.* at 63-64.

> I can only tell you what the final version looks like, you know. I – I don't know. I would assume maybe there was a draft. I mean, we haven't seen it, so I don't know if there was a draft that had their terms in it. But it seems like when it came down to the point where, We're going to sign it, that what was in there, what everybody was available to look at, was agreeable to them.

> *Id.* at 83-84.

At most, Vinopal's testimony shows that some of the parties—and it is unclear who from the evidence adduced by Larchmont—may have contemplated including a provision concerning payments on the land contract being made from frac sand profits at some point. In the end, however, there was no such provision included in either the signed land contract or Larchmont's operating agreement, and neither of the signed agreements incorporates the unsigned, draft operating agreements. Pointing in the other direction, Larchmont's draft operating agreement references and incorporates the land contract, which indicates that the land contract is a discrete agreement that is distinct from the unsigned draft operating agreement. The members of Larchmont later passed a resolution stating that they would make every effort to pay the land contract installments out of frac sand profits, but that action was separate from and subsequent to the execution of the land contract itself. In no way can it or does it bind Bethke or North Shore.

As North Shore points out, Larchmont's argument that installment payments were contingent on the generation of profits is undercut by other language immediately following the discussion of profits in the introductory paragraph of the draft operating agreement: "in the event that the Company is unable, in spite of its best efforts, to profitably market the frac sand on the land and the installment sales payments are not made, the Seller's recourse it to foreclose on the Company." Therefore, even if the members of Larchmont hoped that their frac sand profits would cover the installment payments, they recognized that this might not happen and their installment payments still would be due. Larchmont fails to explain its contention that the land contract includes only the draft operating agreement's reference to installment payments being made from the profits of the sand mine and not the remainder of the paragraph. *See First*

31

*Bank & Trust v. Firstar Info. Servs., Corp.*, 276 F.3d 317, 322 (7ᵗʰ Cir. 2001) ("Words and phrases cannot be considered in isolation; rather, the court must consider the contract as a whole to provide each provision with the meaning intended by the parties."); *Campion v. Montgomery Elevator Co.*, 172 Wis. 2d 405, 416, 493 N.W.2d 244 (Ct. App. 1992) (a contract must be construed as a whole).  Concluding that Larchmont had no obligation to make any payments on the land contract until it turned a profit defies reason.

In sum, the only reasonable inference from the evidence of record is that the land contract and its exhibits, addendum and amendments governs the sale of the property and the operating agreement governs Larchmont and its members.  Larchmont's vague references to the circulation of draft agreements with a particular payment provision relating to frac sand profits are insufficient by themselves to show that the provision was actually part of the land contract or that it was excluded as a result of fraud or mistake.[6]

### C.  Larchmont's Affirmative Defenses

Larchmont does not dispute the fact that it failed to make installment payments under the contract, which provides the remedy of strict foreclosure.  Larchmont, however, alleges the affirmative defenses of laches, unclean hands, fraud, and equitable estoppel in its answer to defendants' amended counterclaim, *see* dkt. 59 at 17-18, and it raises these defenses in its response to North Shore's motion for summary judgment, *see* dkt. 91 at 12-18.  North Shore

---

[6] Apart from generally floating the notion that the provision might have been excluded as a result of fraud or mistake, Larchmont fails to develop a meaningful argument with respect to this exception to the parol evidence rule, and the court does not discern any mistake or fraud from the evidence presented during motions practice.  To the extent that Larchmont raises fraud in other contexts, I address those issues elsewhere in this opinion.

discusses Larchmont's allegations of fraud as a basis for rescission in conjunction with their arguments concerning Larchmont's affirmative claims of fraudulent inducement.[7]  North Shore, however, did not address the issues of laches, equitable estoppel, or unclean hands in their opening brief and North Shore only briefly mentions the weakness of these particular affirmative defenses in a footnote in its reply brief.  *See* dkt. 79 at 21 n. 16.

The Seventh Circuit repeatedly has held that arguments raised for the first time in a reply brief are waived.  *Mendez v. Perla Dental*, 646 F.3d 420, 424 (7th Cir. 2011) ("[D]efendants have waived any challenge to the jury instructions by failing to raise it in their opening brief."); *United States v. Dabney*, 498 F.3d 455, 460 (7th Cir. 2007); *United States v. Blaylock*, 413 F.3d 616, 619 (7th Cir. 2005).  Because North Shore did not move for summary judgment with respect to Larchmont's affirmative defenses, it has failed to show that it is entitled to strict foreclosure as a matter of law and its motion for summary judgment on that counterclaim will be denied.  To hold otherwise would be to blind side Larchmont.

This might turn out to be a bootless victory for Larchmont:  based on the court's rulings earlier in this order, Larchmont may not base any of these defenses on its contentions that the land contract included the term that installment payments were to be made from frac sand profits, or that North Shore had acquiesced to this payment plan in some other way.  The court has rejected these contentions, so they are out of the lawsuit.

---

[7] Although Larchmont presents its arguments concerning fraud and fraudulent inducement in separate sections of its response brief, the cases it cites in support of these arguments show that there is little distinction between the two concepts insofar as Larchmont seeks to rescind the contract.  *See* dkt. 91 at 17 (citing *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 and n. 3 (7th Cir. 2014); *First Nat. Bank & Tr. Co. of Racine v. Notte*, 97 Wis. 2d 207, 222-23, 293 N.W.2d 530, 538 (1980)).

## IV. Fraudulent Inducement

To establish that it was fraudulently induced to enter into the land contract, Larchmont must prove that:

1) Bethke made a representation of fact;

2) The representation of fact was false;

3) Larchmont believed and relied on the misrepresentation to its detriment or damage;

4) The misrepresentation was made by Bethke with knowledge that it was false, or recklessly without caring whether it was true or false; and,

5) The misrepresentation was intended to deceive Larchmont and to induce Larchmont to act on it to its detriment or damage.

*Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 13, 270 Wis.2d 146, 157, 677 N.W.2d 233 (contract fraudulently induced is void or voidable).

In its response brief, Larchmont argues that there are three categories of misrepresentation—intentional (which it alleges in its complaint), negligent, and strict responsibility. However, in its second amended complaint, Larchmont alleges only fraudulent inducement, which is intentional misrepresentation:

> Pursuant to the December 2012 Land Contract, North Shore sold the Property to Larchmont, but Bethke deliberately and intentionally concealed and/or misrepresented several material facts about the Property, the feasibility of using the Property for the intended purpose, and the nature of the relationship between the parties.

> Dkt. 56 at ¶ 65.

> Defendants deliberately concealed and/or misstated those facts with the intention of inducing Larchmont to enter into the December 2012 Land Contract.

> *Id.* at ¶ 70.

34

*See United Vaccines*, 409 F. Supp. 2d at 1093 (intentional misrepresentation properly characterized as fraud in the inducement). In any event, Larchmont has not developed an argument related to negligent or strict liability representation, so I have not considered its claims under those standards.

In addition to the five factors identified above, Larchmont must show that the misrepresentation occurred before contract formation, *Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 30, 283 Wis.2d 555, 699 N.W.2d 205, and that its reliance on the misrepresentation was reasonable. *Kailin v. Armstrong*, 2002 WI App 70 ¶ 31, 252 Wis.2d 676, 702, 643 N.W.2d 132, 146. Silence or the failure to disclose a fact is treated as equivalent to representing the nonexistence of that fact, if the silent party was under a duty to disclose it. *Ollerman v. O'Rourke Co.*, 94 Wis.2d 17, 24, 288 N.W.2d 95, 99 (1980). A party to a business transaction is under a duty to disclose facts basic to the transaction where the other party would reasonably expect disclosure of those facts. *Id.*

In its second amended complaint, Larchmont alleges that it was induced to enter into the land contract by misrepresentations that Bethke made with respect to the following:

> (1) The suitability of the property as a frac sand mine and the quality and amount of the sand on the property.
>
> (2) The true nature of Bethke's reputation in the town and his relationship with neighbors and other town residents.
>
> (3) The complexity of the permitting process as well as the extent of, and the response to defendants' prior attempts to permit the property as a frac sand mine.
>
> (4) The local opposition to mining on the property and lack of support from neighboring property owners.
>
> (5) The representation that North Shore would never foreclose on the property, that foreclosure was not an option, and that any

future payments owed would come from profits from the sale of sand.

(6)  Badger Mining's interest in purchasing both the property and neighboring properties.

(7)  The fact that other property owners in the area were already mining, and/or intended to mine, their properties.

Second. Amended. Compl., dkt. 56 at ¶ 66.

In addition, Larchmont alleges that Bethke had a duty to disclose material facts regarding the feasibility of developing a frac sand mine on the property because:

(1)  Bethke had a business and personal relationship with at least one or more members of Larchmont.

(2)  Bethke sought out Larchmont and its members for the sole purpose of developing a frac sand project.

(3)  Bethke negotiated with the members of Larchmont to co-invest with him in a common business venture as partners.

(4)  Bethke reassured the members of Larchmont that respected members of the local business community and his professional advisors supported the development of the property for a frac sand mine.

(5)  Bethke encouraged Larchmont and its members to rely on his knowledge of the local market for frac sand, his business relationships in the area of frac sand mining, and his knowledge of and experience with the permitting process.

(6)  Bethke knew the members of Larchmont were relying on him, particularly given his representations regarding his experience and knowledge with respect to this property.

(7)  Bethke, individually and through North Shore, made partial representations to Larchmont and its members that he knew to be misleading, incomplete or untrue if left uncorrected or uncompleted.

*Id.* at ¶¶ 68-69.

In addition to compensatory and punitive damages, Larchmont seeks the equitable remedies of rescission of the land contract and restitution, dkt. 56 at 28. *See Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1371-72 (7th Cir. 1990) (noting that it would be unreasonable to make a party choose between two forms of damages before trial and verdict).

In its motion for summary judgment, North Shore argues that: (1) Larchmont's claim for fraudulent inducement is barred by the economic loss doctrine; (2) Larchmont cannot seek rescission and restitution because it affirmed the contract after discovering the fraud; and (3) Larchmont fails to allege misrepresentations that are actionable fraud. I will address each of these arguments separately:

## A. Economic Loss Doctrine

"The economic loss doctrine is a judicially-created remedies principle that operates generally to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." *Tietsworth*, 2004 WI 32, ¶ 23. The Wisconsin Supreme Court has held that the doctrine bars a claim for fraudulent inducement unless the alleged fraud is "extraneous to, rather than interwoven with, the contract." *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 42, 283 Wis. 2d 555, 585, 699 N.W.2d 205, 219 (quoting *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 47, 662 N.W.2d 652). In other words, for such a claim to proceed, the alleged fraud must "concern[] matters whose risk and responsibility did not relate to the quality or the characteristics of the goods for which the parties contracted or otherwise involved performance of the contract." *Id.*

North Shore argues that all of the alleged misrepresentations either concern the quality or character of the property that was sold to Larchmont, or were terms addressed in the land contract itself. *See Ritchie v. Clappier*, 109 Wis.2d 399, 406, 326 N.W.2d 131 (Ct. App. 1982) ("If the facts are undisputed, whether the party claiming fraud was justified in relying on a misrepresentation is a question of law.") (citing *Williams v. Rank & Son Buick, Inc.*, 44 Wis.2d 239, 246–47, 170 N.W.2d 807, 811 (1969)). Larchmont not only disputes this argument, it contends that the doctrine does not apply to its claim against Bethke, who was not a party to the contract; Larchmont further contends that in any event, the economic loss doctrine does not prevent it from seeking the remedies of rescission and restitution.

For the reasons discussed below, I find that Larchmont is correct that the doctrine does not bar its fraudulent inducement claims to the extent that Larchmont seeks rescission or restitution, but Larchmont's contention that the doctrine does not apply to Bethke is unfounded. Further, Larchmont has failed to oppose North Shore's argument with respect to the remaining question—whether the economic loss doctrine bars Larchmont's tort claims against both defendants for compensatory and punitive damages—and merely relies on its unsuccessful argument that there is a genuine issue of material fact as to the terms and scope of the land contract. Therefore, I am granting North Shore's motion for summary judgment as to Larchmont's fraudulent inducement claims seeking damages in tort on the ground that these claims are barred by the economic loss doctrine. These rulings are discussed separately below:

## 1. The Economic Loss Doctrine Is Inapplicable to Rescission/Restitution

In its opening brief, North Shore states in a footnote that it is not aware of any court "that has squarely addressed *Kaloti's* extraneous/interwoven distinction in the context of a fraudulent inducement claim seeking contract rather than tort remedies." Dkt. 79 at 35 n. 22. In response, Larchmont correctly notes that the Court of Appeals for the Seventh Circuit and the Wisconsin Supreme Court both have held that Wisconsin's economic loss doctrine does not bar misrepresentation claims seeking the remedies of rescission and restitution. *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 986-87 (7th Cir. 2003); *Tietsworth*, 2004 WI 32, ¶ 36 (citing *Harley-Davidson* for same); *Digicorp*, 2003 WI App 54, ¶ 35 n. 7 (*Harley-Davidson* provides "an excellent summary of our rationale for the economic loss doctrine."). In addition, this court has held that "*Harley-Davidson Motor Co.* accurately predicts the Wisconsin Supreme Court's resolution of the question whether a contract action . . . alleging fraud in the inducement would survive application of the economic loss doctrine where the plaintiff has requested rescission of the contract." *United Vaccines, Inc. v. Diamond Animal Health, Inc.*, 409 F. Supp. 2d 1083, 1095 (W.D. Wis. 2006).

North Shore seems to concede this point in its reply brief, *see* dkt. 96 at 11 ("Wisconsin law is clear that fraudulent inducement claims seeking rescission and restitution are not barred by the economic loss doctrine."), but then asserted that its argument is different: "fraudulent inducement claims, whether brought in tort or in contract, are only viable when the alleged fraud is extraneous to the contract," *id.* I fail to see North Shore's point. Although North Shore cites *AVL Powertrain Eng'g, Inc. v. Fairbanks Morse Engine*, 178 F. Supp. 3d 765, 774 (W.D. Wis. 2016), as "analogizing to *Kaloti's* extrinsic/interwoven framework in the context of a rescission claim,"

that case does not discuss or apply the economic loss doctrine. The court in *AVL* cited the extraneous/interwoven standard in *Kaloti* as a comparison in its discussion of whether the alleged misrepresentations were material and whether the plaintiff reasonably relied on them. *Id.* To the extent that North Shore is arguing that the alleged misrepresentations are not material or that Larchmont did not reasonably rely on them–which are arguments North Shore raises in other sections of its brief, I will deal with those arguments below.

Accordingly, I conclude that the economic loss doctrine does not bar Larchmont's fraudulent inducement claims to the extent that the remedies sought are limited to rescission and restitution.

## 2. The Economic Loss Doctrine Applies to Claims Against Bethke

Larchmont argues that its fraudulent inducement claims seeking damages against Bethke as an individual are not subject to the economic loss doctrine because Bethke was not a "party" to the land contract. Larchmont cites no authority for this attempted end-run around the economic loss doctrine; that's because there is none. Lack of contractual privity between the plaintiff and defendant does not provide a basis for avoiding the economic loss doctrine. *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 400, 573 N.W.2d 842, 844 (1998) ("[E]ven in the absence of privity, the economic loss doctrine bars a remote commercial purchaser from recovering economic losses from a manufacturer under tort theories of strict liability and negligence."). *See also Digicorp*, 2003 WI 54, ¶ 65 (barring subdistributor of telephone calling services from recovering economic losses in tort from telecommunications provider: "We answered the question in *Daanen* [ ], and unequivocally held there that even in the absence of

privity, the economic loss doctrine bars one party in the distributive chain from recovering economic losses in tort from another party in that chain.").

Relying in part on *Digicorp* and *Daanen*, the U.S. District Court for the Eastern District of Wisconsin rejected an argument similar to that made by Larchmont in this case. *Schreiber Foods, Inc. v. Lei Wang*, No. 08-C-962, 2010 WL 4683726, at *6 (E.D. Wis. Nov. 10, 2010), *aff'd*, 651 F.3d 678 (7th Cir. 2011). Schreiber Foods sought to recover tort damages for misrepresentations allegedly made by the agent of a trading company who was acting as go-between but was not a party to the contract between Schreiber Foods and the trading company. The district court held that even though the agent was independently and personally liable for any torts she may have committed, "the economic loss doctrine, where applicable, is not limited to the actual parties to the contract." *Id.* The same is true in this case. Accordingly, to the extent that the economic loss doctrine applies in this case, it applies equally to the claims against Bethke and North Shore.

### 3. Alleged Misrepresentations Interwoven with the Land Contract

The Wisconsin Supreme Court has explained that "misrepresentations that concern 'the quality or character of the goods sold' are either: (1) expressly dealt with in the contract's terms, or (2) . . . go to reasonable expectations of the parties to the risk of loss in the event the goods purchased did not meet the purchaser's expectations." *Kaloti*, 205 WI 111, ¶ 43 (citing *Digicorp*, 262 Wis.2d 32, ¶ 47 and *Huron Tool and Engineering Co. v. Precision Consulting Services, Inc.*, 209 Mich. App. 365, 372-73, 532 N.W.2d 541, 545 (1995)). For example, in *Kaloti*, the court found that the economic loss doctrine did not apply because Kellogg's alleged failure to disclose to

Kaloti that it had begun selling directly to Kaloti's customers was not a matter that one would expect to be dealt with in the purchase agreement. *Id.* at ¶ 45. The representation must relate to something that is a fact at the time it is made. *Harley-Davidson*, 319 F.3d at 991-92 (citing Restatement (Second) of Contracts § 159). "Such facts include past events and present circumstances but not future events. . . . However, a promise or prediction of future events may by implication involve an assertion that facts exist from which the promised or predicted consequences will follow, which may be a misrepresentation as to those facts." *Id.* at 992 (quoting Restatement § 159 cmt. c).

North Shore contends that all of Larchmont's allegations of misrepresentations can be sorted into four categories that all present issues "interwoven" with the subject matter of the contract: the quality of the sand and suitability of the property for frac sand mining; the ability to obtain necessary zoning and permits; the risk of foreclosure; and the alleged agreement that contract payments would come from frac sand profits.

Larchmont's sole response to this argument is the court cannot make this determination at the summary judgment stage because the parties dispute the terms and scope of the land contract. But the court *has* resolved that issue in this order, finding that there is no genuine dispute as to the facts establishing that, as a matter of law, the land contract does not include any provision that installment payments will be made from frac sand proceeds.

Lawyers often present binary arguments in their legal briefs in order to address both possible outcomes on a disputed point. Not here. Instead of anticipating this ruling as a possible outcome and presenting facts and arguments substantively to refute defendants' contention that the misrepresentations are interwoven with the land contract, Larchmont states only that:

> If the jury somehow, despite all the evidence to the contrary, finds that the Land Contract is limited to the four corners of the Land Contract document as defined by the Defendants, then many of the misrepresentations made by North Shore would fall outside the scope of the economic loss doctrine because they would not be interwoven in the Land Contract.

Dkt. 91 at 24.

By not explaining how any of the alleged misrepresentations involve matters extraneous to the land contract as written and supporting that explanation with evidence in the record, Larchmont has waived the issue and forfeited the argument. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."); *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (deeming plaintiff's negligence claim abandoned because he failed to delineate it in brief in opposition to summary judgment); *Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001) ("The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment.") (internal citation omitted); *Cent. States, Se. and Sw. Areas Pension Fund v. Midwest Motor Express*, 181 F.3d 799, 808 (7th Cir. 1999) ("A party's failure to meaningfully respond to a motion for summary judgment . . . constitutes waiver.")

Given the court's ruling on the scope of the land contract, it may be that all of the alleged misrepresentations are interwoven with that contract, but there is no need to perform a substantive analysis of a party's forfeited arguments. I am granting North Shore's motion for summary judgment as to Larchmont's fraudulent inducement claims except to the extent that Larchmont is seeking the remedies of rescission and restitution. This segues to North Shore's contention that Larchmont has waived its right to seek rescission and restitution by affirming the land contract.

43

### B. Waiver of Rescission as Remedy

The equitable remedy of rescission is available when a party is induced to assent to a contract by justifiably relying on a fraudulent or material misrepresentation by the other party. *First Nat. Bank & Tr. Co. of Racine v. Notte*, 97 Wis. 2d 207, 222, 293 N.W.2d 530 (1980); *Whipp v. Iverson*, 43 Wis.2d 166, 171, 168 N.W.2d 201 (1969). However, even where grounds might exist to set aside a contract, a party waives his right to rescind for fraud or mistake if that party unreasonably delays asserting that right or affirms the agreement after learning of the fraud or mistake giving rise to the right of rescission. *ERA Franchise Sys., LLC v. Hoppens Realty, Inc.*, No. 12-cv-594-slc, 2013 WL 3967869, at *7 (W.D. Wis. July 31, 2013); *Grube v. Daun*, 213 Wis. 2d 533, 551-52, 570 N.W.2d 851, 859 (1997) (plaintiffs affirmed contract by continuing to live on property and make extensive improvements after discovering it was contaminated); *Thompson v. Vill. of Hales Corners*, 115 Wis. 2d 289, 319, 340 N.W.2d 704 (1983) (although village ordinance made plaintiff's arcade unprofitable, plaintiff waived right to rescind lease because he knew about ordinance when he signed lease and delayed asserting rights for six months); *Notte*, 97 Wis. 2d at 222 (As remedy for misrepresentation, "aggrieved party has the election of either rescission or affirming the contract and seeking damages" for breach of contract.). Further, when the facts regarding the parties' conduct after the alleged fraud comes to light are "practically undisputed," waiver is a question of law appropriately decided at summary judgment. *Weinhagen v. Hayes*, 174 Wis. 233, 178 N.W. 780, 786 (1920); *Thompson*, 115 Wis. 2d at 319, 340 N.W.2d 704; *AVL Powertrain*, 178 F. Supp. 3d at 772.

North Shore contends that Larchmont, by signing amendments to the contract in May and December 2013 but then waiting to sue for rescission until 2016, has affirmed its obligations

under the land contract *after* learning of the alleged misrepresentations about the quality of the sand, the zoning and permitting problems, the risk of foreclosure, and the alleged condition that contract payments would come from frac sand profits. In support of this contention, North Shore points to the following undisputed facts: Larchmont knew that the property contained good quality sand from testing that it had commissioned in March and June of 2013; Larchmont's own application for rezoning the property for a frac mine was denied in August 2013, before it signed the December 2013 amendment to the land contract; and any beliefs that Larchmont had about North Shore not foreclosing or being willing to forego payments until a mine was operating were dispelled by the contract amendments that provided for foreclosure but did not provide that payments would come from frac sand profits.

As it has done in its response to most of North Shore's arguments, Larchmont states generally that summary judgment is not appropriate because there are genuine issues of material fact affecting the question of waiver. However, Larchmont *has* addressed North Shore's argument with respect to two of the misrepresentations it has alleged: that payments would be made from frac sand profits and that North Shore would not foreclose on the property.

In a brief argument, Larchmont contends that even though the 2013 amendments adjusted the payment schedule of the contract, they did not change the parties' "basic understanding" that payments would be made from the profits of the sale of frac sand. However, as discussed at length above, Larchmont has failed to adduce sufficient evidence showing that North Shore had such an understanding or that the land contract included this term.

This leaves the alleged misrepresentation that Bethke continued to promise not to foreclose on the property even though the contract and the amendments all contained a

foreclosure provision. Larchmont correctly points out that the parties dispute whether Bethke made such representations both before and after they signed the land contract and 2013 amendments, and that North Shore in fact did not bring a foreclosure action until 2017. Because I agree that the facts are not clear on this one issue, I find that Larchmont has not waived its claim for rescission with respect to the alleged misrepresentation that North Shore would never foreclose on the property.

Because Larchmont fails to address the issues of waiver and affirmance as they relate to any other alleged misrepresentation, including those concerning the quality of the frac sand, the property's suitability for a frac sand mine, and zoning and permitting, Larchmont has forfeited all such arguments.[8]

### C. Actionable Fraud

Larchmont's only remaining claim for fraudulent inducement involves Bethke's alleged misrepresentation that North Shore would never foreclose on the property.[9] North Shore argues that even if Bethke made such statements to the members of Larchmont, any reliance on those statements would have been unreasonable in light of clear contract language to the contrary. *Tietsworth*, 270 Wis. 2d 146, ¶ 13 (plaintiff must believe the representation and justifiably rely

---

[8] In any event, the undisputed facts show that North Shore's contention that Larchmont had reason to know about these alleged misrepresentations by the time it signed the contract amendments in 2013 is well-founded.

[9] In response to this aspect of defendants' argument, Larchmont claims that there also is "ample record evidence" to demonstrate that Bethke made "actionable misrepresentations" by: 1) stating that there was a "consortium of interested buyers ready and interested in developing their contingent properties; and 2) failing to disclose the fact that Badger Mining's offer to buy the property was contingent on it buying neighboring properties. Dkt. 91 at 27-28. However, Larchmont has waived these arguments by failing to explain or otherwise develop them in their brief.

on it); *Bank of Sun Prairie v. Esser*, 155 Wis. 2d 724, 732, 456 N.W.2d 585, 589 (1990) ("Negligent reliance is not justifiable."). North Shore points to the undisputed facts that the land contract contains a strict foreclosure provision and acknowledges North Shore's right to foreclose if payments are not made, and that both of the 2013 amendments reserve North Shore's right to this remedy. In addition, Larchmont adopted a resolution on December 22, 2012, with similar language recognizing North Shore's right to foreclose for non-payment.

In support of its argument, defendants cite *Amplicon, Inc. v. Marshfield Clinic*, 786 F. Supp. 1469, 1478 (W.D. Wis. 1992) (internal citation omitted), for the proposition that "a party cannot reasonably rely upon allegedly fraudulent promises which are directly contradicted by the terms of . . . a subsequently executed contract." In *Amplicon*, a lessor sued for breach of a lease agreement and the lessee raised fraud in the inducement as a defense. *Id*. at 1470. The lessee asserted that, prior to the signing of the lease agreement, the lessor told the lessee that no deposit or interim rent was required under the agreement. *Id.* at 1475. The lease clearly provided that the lessee would pay interim rent and a deposit and contained two merger clauses stating that the lease agreement was the complete agreement between the parties and that no representation was binding unless made part of the lease by addendum. *Id*. at 1479. In light of the merger clauses and the fact the representations directly contradicted the written agreement, the court held that reliance on the representations was not justified as a matter of law. *Id.* at 1478.

Larchmont distinguishes its claim in this case on the grounds that the land contract did not contain a merger clause like the lease in *Amplicon* and that there is disputed evidence that Bethke continued to make representations about not foreclosing on the property through at least 2014. *See Am. Custom Surfacing, LLC v. Manitowoc Cranes, Inc.*, 2012 WI App 11, ¶ 33, 338 Wis. 2d 485, 808 N.W.2d 742 (unpublished decision) ("*Amplicon* adheres to a rule that . . . is

inconsistent with Wisconsin law. The proper inquiry under Wisconsin law is whether all the surrounding circumstances here create a factual dispute on the reasonableness of [plaintiff's] reliance on the misrepresentations that . . . induced it to sign the [contract]."). However, as North Shore points out, *Amplicon* did not announce a per se rule that a contractual party can never reasonably rely on allegedly fraudulent promises which are directly contradicted by the terms of the executed contract. The court in that case considered all of the circumstances surrounding the alleged misrepresentation and concluded that reliance on it was not reasonable. The same is true here.

Although the land contract in this case does not contain a merger clause, Larchmont has not alleged or argued that it is not integrated with respect to North Shore's right to foreclosure in the event of default. Larchmont cites a few cases for the proposition that a plaintiff can raise fraud claims based on misrepresentations that are inconsistent with the express terms of the parties' contract. *See Bank of Sun Prairie v. Esser*, 155 Wis. 2d 724, 731, 456 N.W.2d 585, 588 (1990) (finding question of fact as to whether bank misrepresented terms of a guaranty to induce defendant to enter guaranty contract); *Hennig v. Ahearn*, 230 Wis. 2d 149, 160-61, 601 N.W.2d 14, 20 (Ct. App. 1999) (plaintiff alleged defendant agreed to make two minor changes to draft contract and assumed defendant honored the oral agreement before contract executed); *Caulfield v. Caulfield*, 183 Wis. 2d 83, 92-94, 515 N.W.2d 278, 282 (Ct. App. 1994) (concluding that there were material factual disputes whether the signer of a note reasonably relied on misrepresentations about the contents of a note). However, in those cases, the alleged misrepresentations related to whether the contracting party was misled about what terms the contract contained. As North Shore notes, Larchmont has not alleged that North Shore LLC or Bethke misled Larchmont about the foreclosure provision being included in the land contract,

which is an undisputed fact. In any event, the courts in the cases cited by Larchmont agree that the dispositive question on summary judgment is whether one can conclude from "all of the surrounding circumstances" that there is a material factual dispute as to the reasonableness of Larchmont's reliance on Bethke's alleged misrepresentation that North Shore would not exercise its foreclosure right. *See Bank of Sun Prairie*, 155 Wis.2d at 732-33 (all facts and circumstances, "including the intelligence and experience of the misled individual and the relationship between the parties," must be considered); *Am. Custom Surfacing*, 2012 WI App 11, ¶ 33; *Caulfield*, 183 Wis. 2d at 93 ("[I]n cases where claims of misrepresentation are made, the facts of the case are important to determine if reliance on the misrepresentation is justifiable.").

Even assuming, *arguendo,* that Larchmont's version of the facts is true—that Bethke lied to the members of Larchmont about his intent or willingness to exercise North Shore's foreclose rights in the event of a default, and leveraged his relationship with Benham and Westrate to inveigle them to sign the contract with a foreclosure provision—no jury could reasonably conclude that it was reasonable for Larchmont's principals to rely on those representations when the contract and all subsequent amendments contained explicit language to the contrary.

Larchmont points to draft language circulated by the parties indicating that foreclosure was unlikely to occur, but this does not–cannot– negate the fact that the parties agreed that North Shore retained a right to strict foreclosure. The only logical and reasonable response to oral  representations that contradicted written provisions of the contract would have been to insist that the written contract reflect the oral representation. Larchmont could have–should have–demanded removal of the foreclosure provision or inclusion of an condition further specifying and limiting the conditions under which foreclosure could take place. Larchmont did neither. To the contrary, Larchmont passed an internal resolution after signing the land contract

recognizing the fact that North Shore had the right to foreclose. Although Larchmont chose not to hire an attorney to review the contract before signing it, the facts show that its members are educated, experienced businessmen. *See United States v. Giles*, No. 14-cv-978, 2017 WL 564012, at *5 (E.D. Wis. Feb. 10, 2017), *appeal dismissed*, No. 17-1529, 2017 WL 4173485 (7th Cir. Aug. 25, 2017) ("In determining whether reliance was negligent in a given case, Wisconsin courts also consider . . . the party's intelligence and experience. When Giles signed the note, she was well-educated, she had signed for and received many prior student loans, and the promissory note was short and clear in its terms.").

The Wisconsin Supreme Court has made clear that

> Courts will refuse to act for the relief of one claiming to have been misled by another's statements who blindly acts in disregard of knowledge of their falsity or with such opportunity that by the exercise of ordinary observation, not necessarily by search, he would have known. He may not close his eyes to what is obviously discoverable by him.
>
> *Ritchie v. Clappier*, 109 Wis. 2d 399, 326 N.W.2d 131, 134 (1982) (quoting *Jacobsen v. Whitely*, 138 Wis. 434, 120 N.W. 285, 286 (1909)).

*See also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 768 (7th Cir. 2010) (citing same in holding that "the Agreement [for the provision of electronic banking services], combined with the circumstances of its negotiation, permitted the district court to conclude that any reliance on oral representations in this case was unreasonable."); *Osowski v. Howard*, 2011 WI App 155, ¶ 27, 337 Wis. 2d 736, 807 N.W.2d 33 (unpublished) ("A plaintiff cannot justifiably rely on a misrepresentation while ignoring contradictory information that he or she knew or could have discovered."). Accordingly, I am granting North Shore's motion for summary judgment on Larchmont's remaining fraudulent inducement claim.

## V. Larchmont's Affirmative Contract Claims

As alleged in their second amended complaint and articulated in their response brief, Larchmont's claims of frustration of purpose, unjust enrichment, reformation, and illusory contract are all based on the premise—which I have found to be incorrect—that the land contract provided that installment payments would be made from frac sand mining profits. As with North Shore's challenges to its fraudulent inducement claims, Larchmont's sole response is that the validity of its claims cannot be made on summary judgment because the parties dispute the terms and scope of the land contract. Larchmont makes the same vague argument with respect to its claims for breach of contract and breach of the implied covenant of good faith and fair dealing, stating only that the claims "directly arise from the Land Contract. Here, what the contract consists of is in dispute." Dkt. 91 at 46. Larchmont has abandoned all of these claims by failing to develop any argument about why the claims should survive in the event that the court determines that there was no genuine issue of material fact as to the terms of the land contract. Accordingly, North Shore's motion for summary judgment as to Larchmont's claims for frustration of purpose, unjust enrichment, reformation, illusory contract, breach of contract, and breach of the implied covenant of good faith and fair dealing must be granted.

## CONCLUSION

This order speaks for itself, so there is no need for any wind-up observations by the court. It will be up to the parties to tailor their trial presentations to fit what's left of this lawsuit.

As a procedural matter, I will extend by one day the parties' deadline to submit their Rule 26(a)(3) materials, motions in limine and any proposals as to the voir dire, jury instructions and

verdict forms. The new deadline is November 14, 2017, with responses still due on November 22, 2107 and replies due on November 28, 2017. The December 6, 2017 telephonic final pretrial conference and December 11, 2017 jury selection and trial remain firm.

**ORDER**

IT IS ORDERED that the motion for summary judgment (dkt. 73) filed by defendants North Shore Services, LLC and William Bethke is GRANTED in part and DENIED in part:

(1) Defendants' motion for summary judgment is DENIED with respect to their counterclaim for strict foreclosure, but only to the extent that Larchmont may proceed on the affirmative defenses of laches, equitable estoppel, and unclean hands.

(2) Defendants' motion for summary judgment is GRANTED in all other respects, including Larchmont's claims of fraudulent inducement, frustration of purpose, unjust enrichment, reformation, breach of contract, breach of the implied duty of good faith and fair dealing, and illusory contract.

(3) The parties' first submission deadline for the final pretrial conference is extended to November 14, 2017.

Entered this 9th day of November, 2017.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge